at all, argument not to exceed 15 minutes per side. Mr. Murphy, you may proceed for the appellant. I assume you've reserved some time, Mr. Murphy? Yes, Your Honor. May it please the Court, Eric Murphy, State Solicitor of Ohio, I've reserved three minutes of time. for the defendants in this case. Please proceed. Today, Ohio has one of the most expansive early voting schedules in this nation. It allows early in-person voting on 23 days, including on two Saturdays, two Sundays, and in various evenings. This schedule has succeeded in all recent elections. African-Americans and whites have voted at the statistically same rates, including in 2014, when there was a less expansive schedule in place. Let me make sure that I understand that just factually. So the law is challenged, the Supreme Court vacates the stay, so the election takes place in the way in which the law was passed the legislature in 2014. But then there's this settlement that, as I understand, it's effectuated in 2015, and that restores one Sunday and some evening hours. Is that right? Absolutely right. So your position is that the law that we're taking into account today, along with the settlement, is actually more expansive than the one in 2015? Absolutely correct. It's expansive in ways that are particularly useful to African-Americans, because, as the evidence suggested, they often vote through what is so-called souls to the polls, and adding the additional Sunday makes Ohio very expansive in that regard. It doesn't add back any days. It's still 29. Well, it depends on what you mean. In terms of in-person voting where you can show up, it added an additional day. And in fact, the number of early in-person hours in the evenings and on weekends actually might exceed than what existed under the prior law. But it is a shorter voting period, because before it was 35 days, and now it's, depending on when the registration ends, 28, 27 days. You're saying the total hours under the new law as settled might exceed the total voting hours? Not the total hours, the hours, this is all in the expert report of Sean Trinday, but the evening and weekend hours might exceed the evening and weekend hours under the prior law with the addition of the Sunday. In terms of, the court should keep in mind, in terms of where Ohio looks nationally as well, and in terms of the number of voting hours, in terms of the number of voting of days and number of voting hours, we're in the top 10 of states. The district court found this irrelevant under both Section 2 and the Constitution, but that was fundamentally mistaken. The court relied on the NAACP decision, the vacated decision that was not a binding precedent. But this court's binding precedent actually makes quite clear that those types of multi-state comparisons are appropriate under Anderson verdict. I point you to the Libertarian Party case and to the Green Party case, both of which engaged in the precise multi-state comparisons. In those respects, finding that the laws at issue were some of the most restrictive. But if you can use those multi-state comparisons to find that the laws are most restrictive, the flip side of that is you can use the multi-state comparisons to show that the law is not burdensome. So the district court made several key mistakes in analyzing the burdens and burdens. That was the first one. It ignored where Ohio stands in the country. An additional one is in assessing burdens. It did not look at Ohio's overarching scheme, 28, 29 days total period, 23 days of early in-person. All it did was assess the burdens of Ohio's current law as compared to Ohio's old law. And such a retrogressive approach is not the test under the Constitution and it's not the test under Section 2. In addition, under the Constitution, it looked at only the impacts on a subset of voters and not voters overall. But this court in its Lawrence decision made quite clear when in the Anderson verdict 14th Amendment regime that the court should assess impacts on all voters and not just a subset. And that's another area where I think NAACP is fundamentally inconsistent with this court's binding precedent because NAACP did suggest that that disparate impact analysis was approached, was proper. I don't understand, if you think this is such an easy comparison, why the Fifth Circuit on Bonk has adopted the opinion and the test posited by the Sixth Circuit and now the Fourth Circuit has also adopted it and the, I think, Eleventh and Ninth have agreed that the Jingles factors should be applied. So keep in mind what part of the test. The Fifth Circuit didn't even talk about Anderson verdicts, so that's off the table. That's not the Constitution. With respect to Section 2, and with respect to Section 2, the Fifth Circuit did not even consider, for instance, our objective benchmark requirement because it wasn't even in play in that case because it was a more burdensome photo identification requirement and the state didn't even argue the objective benchmark factor. Don't you think if the objective benchmark was in fact the applicable test that it would have had to make a reference as opposed to adopting what the Sixth Circuit and the Fifth Circuit on Bonk had done? Let me suggest that the reason they didn't talk about the objective benchmark is because in the photo ID context, the objective benchmark is just a system without the photo ID, so there was no need to talk about it. In this case, however, it's not at all clear when you're talking about number of days. What is the appropriate amount of number of days? So it's very similar to the Holder case from the Supreme Court where Justice Kennedy in a plurality decision suggested that the number of commissioners for a county commission, it was just an arbitrary number whether you have one commissioner, two commissioners, three commissioners, and so that type of analysis should not be made. Here, I think we're in the same context. What is the appropriate number of early voting days in which to assess whether Ohio actually abridges the right to vote under Section 2? If it's the vast majority of the country, Ohio would actually benefit African-Americans if you take the district court's conclusion that they use early in-person voting more than other individuals. So I think, if anything, the only objective benchmark would be election day voting for several reasons. First, the U.S. Supreme Court has said there's no constitutional right to absentee balloting. Number two, the generic rule of statutory interpretation that states have early in-person voting, so suggesting that Ohio's... I struggle with the idea that you can go back in history and compare how voting was undertaken in the 1800s and forward to what we do today, because by doing that, you're ignoring the fact that during much of that time frame, the very issue that generates this case, slavery, was legal and in effect. So to say we didn't do this in the past when we already had that taken care of because those individuals were owned and could not vote, it does not make a logical sense to me that that is an argument that supports a differing definition under the Voting Rights Act, whose purpose was to address social and historical conditions that have, or currently produce, discrimination against members of the protected class. Don't you think we need to be in the same situation? I don't think so. For purposes of the Voting Rights Act, I think the relevant year would be 1982, the year of amendment, and in 1982, nobody had early in-person voting. But even setting that aside, even assuming that Section 2 can evolve with evolving election regimes, Ohio would still come out on top because today, Ohio is in the top ten of states. So whatever benchmark we decide is the... The problem for me, again, is I'm struggling to understand how, when, what the Voting Rights Act is addressing is those items that directly impact this protected class in the context in which they live. Why you would want your benchmark to be other states whose systems may be in no way comparable or even comparable to Ohio's isn't what the protected class suffers at the hand of the changed law. Directly in Ohio, the very thing that we need to look to and compare to see if that has occurred and if there is a link or a cause related to social and historical conditions suffered by this protected class. So I guess the first point, I don't necessarily disagree that, I do think that other states are relevant, but even if you look at only Ohio, I don't think that the relevant benchmark should be the old law because the Supreme Court has repeatedly said that such a burdensome old to new comparison is reserved for those Section 5 states that actually have a history of discrimination and Ohio was never one of those states. So I think they fail on the burden of proof points. What is your strongest case for saying that the argument you just made applies in this context? Are those voter denial cases? Are those ballot access cases? They're vote dilution cases. I fully concede that they're vote dilution cases, but the Supreme Court has made this repeatedly clear. I would say that this court has extended the objective benchmark requirement from the vote dilution cases and its Moore decision. Its Moore decision was not about dilution, it was about a change from an elected system to an appointed system and the court looked to the vote dilution cases to say in Section 2 land, not Section 5 land, we need to have an objective benchmark and the court's vote 1, Reno 2, Georgia v. Ashcroft and the Holder case itself all say what the objective benchmark is not and the objective benchmark is not the old practice. The objective benchmark is what the right to vote ought to be is what the Supreme Court says. Their only response on this point is to suggest that those are vote dilution cases. I don't think you can distinguish this court's precedent in Moore and I don't think you can distinguish dilution cases from what abridgement cases or what voting processes cases on the text because the objective benchmark requirement, the Supreme Court says, froze from the word abridge and abridge is equally applicable in this case and in the other cases. I would say even taking V.C. as a granted, the Fifth Circuit's en banc decision, I think we still win in this case because V.C. itself in response to the dissent's suggestion that under the V.C. approach all voting laws would go down, the majority itself went out of its way to suggest that the Texas photo ID law in that case was a law that was the strictest in the nation and was a law past any state that had a pretty significant history of discrimination. Now compare that case to this one, a top 10 state in terms of the election schedule that it has today and no history of discrimination so it's never been a Section 5 state. If there are no further questions, I'll save the rest of my time for rebuttal. Thank you. May it please the Court. My name is Mark Elias and I represent the appellees in this case. Let me return to first principles because in some respect this case is relatively straightforward and in some sense this Court has already considered these issues before. The state of Ohio in 2004 had a calamitous problem with long lines. The whole nation saw it, I was the general counsel to the Kerry campaign, I saw it. People in Ohio saw it, people around the country saw it, and the legislature in Ohio saw it. And they realized that they needed to institute a fundamental change in the way in which Ohio runs elections. Now, the problem with saying it's a top 10 state, it's a top 10 state for what? Measuring the number of days one can vote is one way to tackle the calamity that happened in 2004 but it is not the only way. Minnesota, for example, with almost no history of early voting, almost no history of absentee balloting provides for a vast number of in-person locations. Fasteners, churches, schools, local establishments. You need a location in your neighborhood, they give you a new voting location in your neighborhood. They have same-day registration. So, of course, they don't list on the top 10 for number of days but they don't need that. That's not the culture of Minnesota. That's not the need of Minnesota. North Dakota. North Dakota has no voter registration rolls at all. You just show up and vote. Again, won't show up in the top 10. Colorado, a vote-by-mail state. Washington State, an entirely vote-by-mail state. Where does Ohio show up in these other indices that you're looking at? Your Honor, there is no macro-indice. The reason why the Voting Rights Act is an intensely local analysis is because what it requires this court to do, and in fact what this court did in the NAACP case, is look at the facts and circumstances of Ohio. What are the problems that Ohio has had? How has it solved those problems? How have those problems burdened the minority population of Ohio? And what will the change in law in this case do to burden minority voters when compared to the rest of the electorate? And the fundamental problem that the state has here, which was the same fundamental problem that the state had in the NAACP case, is that a trial judge, considering all the witnesses, all the experts, having heard from Mr. Trendy and having discounted the value of his report, having heard from experts on both sides, having heard from lay witnesses, made specific findings of fact. And the state does not challenge them because the state cannot challenge them. They're subject to clear error, and the state alleges no clear error. And what the- But that's a conclusion of law, are they not? Did not the trial judge find that the burden here was a moderate burden rather than a minimal burden? You would concede that's a conclusion of law, not a finding of fact, would you not? So I think that, Your Honor, that two things. First, in the Section 2 analysis, the fact that these laws disparately affect minority voters is a pure question of fact. So step one of the two-part analysis in the Section 2 context, I think, is a pure matter of fact. In the Anderson-Burdick context, the constitutional analysis, I would argue that, in fact, he- it is a finding of fact as to whether it is a moderate burden. The degree of burden is a finding of fact as opposed to a conclusion of law. Correct, because it is a finding based on the testimony that he heard and the evidence that he considered as to how- If we accept the facts that he found, taking those facts, then the legal conclusion is the degree of the burden, is it not? I don't see a factual dispute there. If the facts are what they are, and then do these facts amount to minimal burden or moderate or severe? Right. I think, Your Honor, though, that determining how much those facts actually affect individual voters and classes of voters is a determination of fact that benefits from the trial judge having seen the demeanor of the witnesses, having examined the- heard the testimony of the expert, I think does benefit from and is a finding of fact as to how much burden it actually has on the protected classes. Is there any proof in this record that anybody in this affected class won't or can't vote during, we'll just call it the 29 days as opposed to the 35 days? I think what we know is that African Americans use the Golden Week at a rate five times that of whites. Well, I accept the premise that it may be more convenient for certain people to vote at different- on different days or different weekends or different times of day, evening, that kind of stuff. So I don't think anybody can dispute that. But I want to look at this in two ways. Is there any evidence that people that have shown statistically that they're going to vote during a certain period won't or can't vote during the period of time that Ohio is providing under SB 238? Yes, Your Honor. I think that the evidence, I can't- I don't think it- to answer your question really precisely because I don't want to- I don't want to misstate here, I don't think that there is evidence that we say Joe Jones, you know, this individual. But as a statistical matter, the fact is that what the experts' analysis in the court found is that because of this, the cost associated with voting for African Americans, the need to come back twice, the need to- the lack of transportation, the challenges they face in terms of daycare, the cost associated with voting by mail, does in- will in fact lead to less- The cost of voting by mail, how much does it cost in Ohio to vote by mail? I think the costs are not just the- How much does it cost? I'm asking you. Does it cost 50 cents to mail the ballot or 60 cents? What is the cost? Well, I think it costs the time to get the ballot, fill it out, bring it to a post office- You don't have to get it. I thought it was mailed. I'm sorry. Fair enough. Mailed to you- You just have to put a stamp on it and put it in your mailbox, right? Well, you may need to- you may not trust the mail. You may not trust the mail. Which was a specific finding in this- in the- by the trial court, subject to a clear error standard that African Americans have a greater distrust- What does that come from? I did see that in the record. But what is the distrust of the U.S. Postal Service by the African immunity? How does that arise? I think it has arisen by years and years of African Americans having a sense that their participation in the process was going to- that their votes were not going to count. You see it in national- if you want to talk about national polling, you see it in national polling. Do you think the U.S. Postal Master is prejudiced or- I don't- I mean, I- No, your honor. I don't think it's necessarily a distrust of the Postmaster. I think that, honestly, if you look at the objective data in this- in Ohio, ballots returned by mail have much higher rejection rates than ballots in person. Do you have any reason to believe that the factor that you're describing as a distrust of the post office would be any different in Ohio than in any other state? Of course. At least in the minority community? It might very well be. It might be very well be different. I understand. It might be. It might not be. I'm just asking you, do you know if that's true everywhere, or do you believe, for whatever reason, it's different in Ohio? I believe it is present in some states. I have- anecdotally, I have worked in other states in voting rights cases where that has been the case. In other places, I will not say that it is universally something that I have found to be- that I've heard in all states. So if we look at this question of access, you can look at it in terms of the number of days, or you can also look at it in terms of same-day registration, and that's where you were going in just a minute. So if we stick just briefly with the number of days, we don't have any evidence that people that vote during the last six days wouldn't vote in the remaining 29 days, except there's a prediction by experts. Is that correct? I'm sorry, when you say the last six days, I'm losing- Yeah, you're right. I should have said first of the 35 days. That's what I thought. Okay. No, you and I are on the same wavelength. So there's a prediction by the experts that because that's used heavily by African Americans, that they either then won't vote in the 29 days, or more people will be compressed into the 29 days and the lines will be longer. Do I have that basically understood? That is correct. All right. Now, why then, if I'm correct that this is true, why did the participation rates stay the same between 2010 and 2014, two off years, when an even more severe regime arguably was in place prior to the settlement in 2015? Right. So I think there are a couple of answers to that. First of all, I think, and the trial court said this, that it is dangerous to take simply participation rates in a broad sense and use those as predictors. You have a number of factors that are going to affect turnout rates. You're going to have how competitive the elections were, how competitive were the down ballot elections. There was, I believe, a governor's race in 2014 that presumably drew out a greater turnout than would have been in 2010 when perhaps the elections were less competitive down ballot. I don't know that, by the way. That's not in the record. But what is in the record is that the court correctly pointed out that, and this is a matter of social science, which is one of the reasons why Mr. Trendy's report was so straightforward. You can't, there are lots of things that go into turnout rates. What is the mood of the country? What is the mood in the state? What are the nature of the competitive elections? Who are the candidates? Are the candidates particularly appealing? President Obama presumably generated higher turnout rates among certain communities than another candidate might. The comparison is on off-presidential elections. Right, but in off-presidential elections, you still have the fact that there are things motivating people to vote. The second, though, Your Honor, is- Are there different restrictions on the states as to what they can and cannot do to change their election laws that are going to be applicable to presidential years versus off years? Well, Your Honor, lots of states, and I do provide greater voting access, usually in the form of more polling locations, greater allocation of voting equipment in presidential years because there will be higher turnout. The second reason, though, why it's dangerous to try to compare 2010 to 2014 is that off-year elections tend to focus on the most committed, the most dedicated, and the most educated voters. The people who vote in off-year- I understand. I understand the argument. I'm struggling to see where they fit within our analysis. If these are findings of fact that a district judge made after 10 days of trial, 20 witnesses, 8 experts, then we owe not being fact-finders ourselves, we owe that fact-finding deference. So isn't the question here whether the court was clearly erroneous in making his factual determinations based on the evidence that was presented? Your Honor, that is precisely the question before this court, and the state is deafeningly silent in challenging the factual findings of the- What do you say as far as whether the burden is a question of fact or a question of law? I would say the burden is a question of fact because it goes to- the court is in a- So picking between minimal, moderate, and extreme is subject then merely to an abuse of discretion standard? Correct, Your Honor. Do we have any authority that suggests that? No, but I think it's- I don't have any standing here. I think though that it is self-evident in some respects that the trier of fact that the trial court, having heard the testimony of the witnesses, is going to be in a position of making a factual finding as to how bad are the lines going to be? What are the additional people going to mean for people's ability to vote? What are the transportation issues going to be? What is that burden? I'm just curious. Where do you derive a constitutional right to stand in line for a shorter period of time? You derive-  Sure. The right at issue is the right to vote. And the state is not permitted, regardless of race, to deny citizens the right to vote. However, in the Voting Rights Act- Standing in a line doesn't deny anybody the right to vote, just more inconvenient. Your Honor, if there is an abridgment of the right to vote that is targeted at a minority community, let's assume for a second that the state of Ohio said, we're going to make sure that white people can vote in five minutes and black people will stand in line for- But if there's targeting, that's the Fourth Circuit case. You and the question you were just asked wants us to accord deference to the factual finding of the district judge, who found no intent to discriminate in this law. So let's change the hypothetical. Let's assume for a moment that the state of Ohio allocated one voting machine per hundred people in County 1 and one voting machine per 10,000 people in County 2. So it was one to 100 in one place, one to 10,000 in another. We all get mail ballots and the subjective feeling that the post office will not deliver my ballot, doesn't the subjective feeling have to be a reasonable belief? If you're saying the scheme denies somebody the right to vote, if the scheme itself is that it's unfair, but if it's not, are we going to rule on cases based upon unreasonable subjective feelings that have no basis in fact? Isn't that what you're asking us to do by throwing out the mail part of it? No, Your Honor. I'm asking you to follow the findings of fact of a federal district court judge who didn't find that they were unreasonable. Didn't find- It is unreasonable. I would say as a matter of law that a belief that your vote will not be counted if you put it in the mail is unreasonable as a matter of law. Well Your Honor- No reasonable person could possibly believe that. I'm over my time, so I don't know whether I- No, I mean- Please answer. Okay. I would answer it this way, Your Honor, with two answers. The first is that if you look at rejection rates and counting rates of ballots in the state of Ohio, in fact, mail-in ballots are counted at a lower rate than counted by ballots cast in person. That's not a distrust of the mail. That's a distrust of the Ohio people that are doing the counting. It's a distrust that if you mail your ballot, it is as likely to be counted as if you show up in person. So that's number one. Number two, Your Honor. The fact is that the African-American community, the Voting Rights Act was passed for a reason, and Congress made a fundamental decision that it exercised power under the 15th Amendment that it was going to tell states that they could not engage in practices that were going to have the effect- Cause. The effect. The effect. Okay, it has no effect. It does have an effect. But the irrational belief that the mail will not be delivered does not have an effect on it. They think it does, but it doesn't have an effect as a matter of fact. But Your Honor, if they, as a result, vote in lower proportions, it does have an effect. It has exactly the effect that the Voting Rights Act was intended to prevent, which is to affect the voting of African-Americans. Whether or not it's reasonable. That's the whole point. You know, you're supposed to throw out rationality and reasonableness here and say irrational thoughts and beliefs can control, and we're going to make Ohio have a law that, although it is reasonable, it may be thought by some to be- Your Honor, I think that what the court ought to do is to follow the decision of this court in NAACP- The vacated opinion that was stayed by the Supreme Court. The opinion that was stayed by the Supreme Court under Purcell grounds? No, that was the other. You put that in your brief, that the Supreme Court stayed it because it was an election case. The order of the Supreme Court doesn't say the reason at all. It just says that it stayed, period. And I would think the presumption would be that the Supreme Court has applied the standard stay factors, maybe with a fifth factor of election in there, but you say that it was stayed because of the close proximity to the election, but it doesn't say that. I would think the more rational inference is it stayed because it's likely to be wrong on the merits, which is the number one factor of a stay. Well, Your Honor, the Fifth Circuit and Bank didn't believe so. The Fourth Circuit didn't believe so, citing the Sixth Circuit opinion as vacated for other grounds. I would also point out that the same time that this was stayed, it was contemporaneous with the Wisconsin case being stayed by the Supreme Court, the North Carolina case being stayed by the Supreme Court. I believe there was one other court, perhaps Texas, I don't recall. I think the logical inference was not that all of these courts of appeals got it wrong, but rather that the Supreme, because they were cutting in different directions, different issues, it was that the Supreme Court does not want decisions, elections to be. You say that. What's your authority for that statement? I think it is. I think that if you look at the courts holding in Purcell and its jurisprudence under Purcell, I think it's the most logical inference. I don't have a... Yeah, it is. Judge Schrantz, you had a question you wanted to ask? No, I'm fine. Thank you. Okay, thank you. Let's just follow up then on the one thing that you were talking to me about in your hypothetical when we went off into Judge Griffin's question. You were talking about a state couldn't assign one polling place to 10 people in a white neighborhood and one to 100 people in a black neighborhood or something along those lines. There's no suggestion of that in this case, is there? Well, I think that is in fact when you have African-Americans using Golden Week at a rate five times that of whites and you have the state repealing that where there is no administrative burden to administer it. It costs virtually no money. It actually decreases fraud. I think that that is an analogous circumstance. So any time you're taking a convenient... Any time you're making something less convenient, then there's a higher burden on the state to justify that move and less deference given or presumptions given to the legitimacy of the state reason. Is that basically the hypothesis that you're operating under here? Well, no, I'm operating under the findings of fact of the district court that found specifically what the burdens were to the state, what the effects it would be on the African-American community and voters. And I think absent clear... But under that analysis, isn't any change that makes voting less convenient, if we can agree on that particular word, going to arguably be disproportionate in connection with the African-American community? No. I think there are... First of all, I wouldn't agree that Golden Week is simply a matter of convenience, but I understand the concept. I think there are lots of things that the state of Ohio could have done that might have, for example, impacted white voters more than African-American voters. But they didn't do that. They chose something... And again, this is not an intentional discrimination case. But the provision at issue here is used five times more by African-Americans than it is by whites. And does it make any difference that this whole proposal came from a bipartisan election official commission? No. Four Republicans, four Democrats. No. It may affect a partisan claim, but it doesn't affect the rights of African-Americans not to have their voting rights abridged by the actions of the state. I guess what that brings back to me and what I continue to struggle with is the record below, because it's very difficult, I think, at the appellate level to impose reasonableness, our own reasonableness ideas on what would work for very different demographics. I get in my car. I drive. I go vote. It's no big deal. For someone who has to find childcare, can't get off work, or loses pay, might lose a job, it is something very different. And it seems to me that's why I'm struggling with the importance of the fact findings below, because they are based not on what I think might be easy or what you think might be easy, but on sociological and historical analysis from experts that tells us how these various factors impact a voting minority. Is that not part of the basis of why we have this intense fact-finding issue below? And then we have the two-part test which requires not only that we look to those fact findings, but that we look to whether the social and historical conditions are implicated in that factual determination. Your Honor, I think that's entirely correct, and it goes to the answer I gave to Judge Griffin. Interestingly, Judge Griffin, the state is not here saying that they believe that factual finding was erroneous. They're not. They're not urging you to... What are we talking about? About the mail. About distrust. There is nothing in there. Okay. Whether they... I don't see the relevance. That's all. Well, but it's a factual finding by a district court judge subject to a clear error. With all due respect, Your Honor, whether... I think things that are reasonable, if it's an unreasonable restraint on voting, I mean, that's something. But if it's reasonable, but it's just perceived differently, and the perception is subjective and totally irrational, that's hard for me to change the law based upon irrational fears. That's all. Well, Your Honor, a couple of things. First of all, the entirety of the fact finding does not hinder on the mail point, so I don't want to blow that up into... That's a big part of it. It's a piece of it. But Your Honor, I would say with... I'm talking about denying a protected class the right to vote, and the right to vote is there by mail for sure, and that's very easy to do. It is an abridgment as well. Not just a complete denial, but an abridgment. And Your Honor, with all due respect, I realize I am a visit... Did the judge find it was cost prohibited to vote by mail? Excuse me? Cost? Was cost prohibited to vote by mail, or cost inconvenient? I mean, you talked about the cost, which I assume is about 50 cents, maybe 60 cents. I mean, I don't know what the ballot in Ohio looks like. In Michigan, the ballot would be about 60 cents, it would be less than a dollar. So it's not the economic cost. You're talking about the time it takes to put the ballot in your mailbox is prohibited... Let's see, what else would it be? To register. To go and register. On a different day. Okay, that goes back to the Golden Week. But that's the only issue, that's the only provision we're challenging, is Golden Week. So what they're doing is they're requiring that person to take off time from work, find transportation, find childcare, go to register. Now come home, now get their ballot, and now vote separately. Because they do require that you register in person. Correct. There's no constitutional right to same-day voting. You would agree with that, wouldn't you? There is no standalone constitutional right to same-day voting. So one would have to say, I think as we've talked before, that once having given, it can't be taken away. If there are experts that would say that it would have a disproportionate impact. I don't think it's if there are experts who would say. I think that if a trial court weighing all of the experts, and there are experts on both sides here. But if a trial court finds, as a matter of fact, that it abridges African Americans' right to vote in line with Section 2 of the Voting Rights Act, then that is a change that is going to be subject to Section 2 scrutiny. I would again just say that this was not a preliminary injunction hearing where we came in with a bunch of affidavits and said, here, go do this. This judge held a full 10 days of hearings and considered all of them. When you read his report, I'm sorry, his opinion, he identifies each expert, whether he found them credible. He identifies each claim, and he says what evidence he found in support of it. And Your Honor, Judge Griffin, I am a visitor in this courtroom, so I am mindful of that. But to be honest with you, in our adversarial system, if the state of Ohio does not believe it was a, did not offer an argument or testimony that the cost of voting in person or the distrust of the mail, if they didn't argue it, then honestly, I don't think it is within the providence of a court of appeals to simply say that they disagree with a point not argued by counsel, not challenged below. They simply are going to reverse the findings of a district court and find it clear error just on their own, on their own, sua sponte. All right. Thank you. Thank you, Your Honor. Thank you, Your Honor. A few quick points. I'd like to start with Judge Griffin's question on findings of fact versus legal questions. I absolutely think the ultimate finding of what category of burden it is, whether minimal, modest, substantial, or severe, the court actually almost created a middle modest in between substantial and minimal. But I think that is absolutely a legal question. It's a mixed question of law of fact. You see this all the time. Do you have authority for that? So I have plenty of authority where the Supreme Court, for instance, just looks at the relevant facts and makes its own determination. Look at Burdick. Burdick was the question of write-in ballots and a ban on write-in ballots. The district court found that severe. The Supreme Court agreed with the Ninth Circuit that it was not. It did not defer to the district court at all. So I don't have cases saying de novo review, but I have plenty of cases suggesting all of the courts' Anderson-Burdick cases seem to engage in an independent review of what the ultimate. And I think that makes sense because it goes to what the standard of review is. And obviously, the standard of review is a legal question. The distrust of the mail point. We don't dispute the fact that people testified about that. We dispute its legal significance. Its legal significance is a de novo question because it goes to the burden again, it seems to me. And I would point the court to the Ninth Circuit's decision in Weber. There, it was a person coming in and saying they distrust touchstone screens because they think they're more readily used for fraudulent voting. And the Ninth Circuit rejected that analysis and said the minimal rational basis review applies. So I think we have always questioned the legal significance of that finding. We completely agree. Do you disagree with the Fifth Circuit in Veazey that found that the district court did not clearly err, the clear error standard, in finding that that act imposes significant and disparate burdens on the right to vote? So I don't disagree with the Fifth Circuit's decision. I do disagree that we're making any type of legal arguments, even in our Section 2 question, that would be subject to the clear error standard. Statutory interpretation is a legal question. What a statute means, what are the factors. So with respect to Section 2, let me give you the best example. My friend on the other side suggested that the district court actually analyzed the ultimate participation data. The district court absolutely ignored that data. There's nothing in the district court's decision about the fact that African Americans and whites vote at statistically the same rates. And I think that is a legal error, because I do believe, even Jingles itself- My memory of the court's analysis below is that he did in fact address each and every expert and gave credence greater to some, lesser to others, gave the statistical breakdown for how Golden Week was used several times more by African Americans than by other voters, and then questioned the methodology or the testing methodology to determine what expert would not be considered. I know there was another analysis of what is significant statistically might in fact still be a difference that would make a difference legally. So my memory of that opinion is not that he ignored something. Perhaps he decided against your position, but I don't see an ignoring of the data presented. So the district court found a disparate impact based on the usages of Golden Week. The district court did not engage in any analysis on how African Americans and whites have ultimately turned out the registration and participation data in any elections. It's nowhere to be found in the district court's decision, and I respectfully suggest that that is error. I would point the court to Jingles page 77, where they actually reversed the lower court with respect to a particular multi-member district, where the evidence was undisputed that African Americans had voted for the candidate of their choice in several recent elections. That macro-level data, in Jingles itself, they reversed a lower court. I think the same analysis would apply here. I also think what's... You would apply the Jingles factors. So that was a dilution case, but I do think what is the test? Absolutely a legal question subject to de novo review, and under our view of the law, the court can only enter judgment in the state's favor. Whether an objective benchmark element is applicable, legal question. Whether you have to prove causation before you get to the totality of the circumstances, as Jingles itself suggested, because it has both preconditions and then the totality of the circumstances, a legal question. So on those two bases alone, purely legal. You can accept all the factual findings of the district court that you want. You'd still have to reverse if you accept our view of the law. With respect to registration, it's not a requirement in Ohio that you have to register in person. Anybody can return it for you. You can return it in the mail as well. So I think that was a factual inaccuracy. With respect to a finding of anybody actually being prohibited from voting, I don't think there was any finding in the record. I think the district court actually... You can register by mail in Ohio? Yes. I thought Mr. Elias said that's not correct. I think I asked him that, didn't I? Well, I... Is that inaccurate, Mr. Elias? I think I misspoke. I was actually... I apologize for that. Okay, you can register... I apologize. I realized it after I sat down. Thank you. The district court also made no factual findings on anybody actually being prohibited from And with respect to NAACP, I completely agree. We certainly briefed the merits of that the last time when it was at the Supreme Court, and one of the state factors is a significant possibility of reversal. So if there are no further questions, I'd... I do. I've got a question about our deadlines for ruling. The Supreme Court in 2014 issued their stay on the 29th of September, and there's controversy as to whether that stay related to the merits or whether it was just because it was so late in the game, the Supreme Court was not allowing any changes in the election procedures and therefore the injunction issued by the district court was put on hold. We don't want to be in that situation again. So, what would be our time frame in the opinion of the state of Ohio for us to make a ruling timely so that if the Supreme Court were to review this, they could do it on the merits and not based upon the lateness of it? Let's expand the question a little bit, if I might. I think we can reasonably anticipate, given the importance of this case, that there may or may not... Somebody's going to ask for a panel re-hearing. I would hope you just agreed not to do that. Never gets anywhere. Second of all, suggestion that we hear it on bonk and then somebody is going to be unhappy with the end of that result, whatever it is, and then going to want to file a petition for certiorari. So to get this all done, when do you need a decision from us? Well, in our motion for expedition, we recommended a decision as soon as possible in September to give a month for both en banc review and Supreme Court review, if possible. Yes, obviously, last time around, we had to seek simultaneous review both in the en banc and in the Supreme Court, and I think it's just more efficient for both sides to have en banc and Supreme Court. Was there a date in September that you... September 29th, obviously, was a little too late. Yeah, well, so the early voting would be set to begin if my memory serves me October 4th. So backing back from that, that would be October 3rd would be the equivalent of September 9th, and we don't want to have that happen this time. I understood you to say in the motion that you wanted a decision by the end of August, early part of September. Exactly. Am I right about that? Not September 29th. Absolutely, yes. What do you think, Mr. Ellis? When do you need a decision from us? I think that I was going to say that the end of August is probably necessary in terms of the other items. Are we talking about our panel as opposed to the court en banc, or what are we talking about? So that would be the panel. Obviously... Because after that, you're going to petition for en banc, I assume the losing side, and that's one of the problems we had last time is we were voting en banc when the Supreme Court intervened and issued the stay. I mean, our voting was going on. You want to say something? Yeah, I think the other... And I apologize. No, go ahead. This is a discussion. Yeah, okay. This is important to me. Yeah, the other question that I'd ask the state is when do they need to finalize the training materials? Because that's the other thing that... Purcell is partially motivated by the idea that the state needs, at some point, to have a set of rules so that it can actually conduct an election. So I don't know what that deadline is, but I think that would be as important as anything. There's a lot of whispering going on. If you want to ask your people that are doing the whispering, Mr. Murphy, you may. If we could just have a moment, Your Honor. Sure. Let's get it right, whatever it is. And I do want to apologize for that misstatement. Oh, I just don't know the Ohio law, that's all. Mr. Ellis, I will say I think you do a remarkable job keeping track of the different states on behalf of your many clients this time of year. Thank you. Thank you, Your Honor. I thought you did a very good job overall. How many of these are you doing? Your Honor, after this, I fly to Arizona for a hearing tomorrow on a law that they've just passed. And then North Carolina looks like it's done, unless there's a Supreme Court review. And then Wisconsin is still in front of us, and Virginia is going up to the Fourth Circuit next month. So the answer is, a lot. So Your Honors, I think, obviously, we want to have, as long as we have a decision before August 4th from the Supreme Court, so just going all the way back, so there has to be October 4th from the Supreme Court. So to have exhausted a Supreme Court review before that time. So it just depends on how long the court thinks the en banc proceedings will actually take, and then how long the Supreme Court. So I was thinking two weeks or three weeks. Give the en banc court time to vote, and then get briefs, and then decide a case. I mean, that's got to be, I would think, at least a month. We're not the fastest government. So I mean, the sooner the better is obviously my answer, but I don't want to pressure the court. When is the answer to the question, when is Ohio prepared to have completed its training? Because it's now. So I didn't, as far as I can tell, I did not think that. The main concern is getting a decision before Golden Week, from the Supreme Court, before Golden Week, which is October 4th, under the court-ordered reinstatement. It's set to begin on October 4th. So we want to have exhausted all appellate review before that date, so we can issue directives. Obviously, it would be best to have a few days before to issue directives. Going back from October 4th, how much time does the Supreme Court need to review the briefs? Well, they had three days to do that, so I think they'd be— You know, a couple weeks? Certainly a couple weeks would be the most efficient, but then obviously that's— We need generally at least a couple weeks or more, so you're actually backing us up earlier than September 1st, aren't you? I'm just very cautious to be dictating when I think a decision should come down, but— We asked. We can expedite this as we can do. Mr. Ellis, you had a suggestion? Your Honor, I would just, again, the thing that I am most worried about with all of this, obviously I'm worried about the court's time, but it seems implausible that a decision should be made if the court rules the day before Golden Week is going to begin. Either way, right? I mean, I suppose if it affirms right now Golden Week is going forward, so that's the status quo, but either way, it strikes me the state is going to need to notify a whole lot of counties about how to operate during Golden Week, and again, this is the state's burden, not mine. I just don't want to be in a situation in which the state two months, a month from now says, well, now we can't do it, it's too late for us to train our people and issue directives. So if they're saying they can do it on a day's notice, I'll take that representation. It seems to me unlikely that they can do it on a day's notice. Are you both in general agreement that you'd like us to decide sometime in the last two weeks of August? That would be terrific. That seem reasonable? Yes, Your Honor. All right. Anything else? Nope. Anything else? All right. We will take this under consideration, of course. Thank you for the excellent briefing that you filed on an expedited basis and showing up here today on short notice as well, so we appreciate it. It's been very helpful to the Court. Case will be submitted. Please adjourn the Court. This Honorable Court is now adjourned.